# Harrington *v.* The State.

## *Indictment for Murder.*

1. *Motion in arrest of judgment; defects in organization of grand jury.* An order of court, or other action of the presiding judge appearing of record, relating to the formation or organization of the grand jury, and without due warrant of law, is good ground for a motion in arrest of judgment, or available on error; but, under the statute (Code, § 4889), the objection can not be thus raised, that the record does not affirmatively show that the persons who acted as grand jurors were the persons drawn by the officers, nor that they were sworn as required by law.

2. *Same.*—A plea to an indictment, on the ground that the grand jurors were not drawn in the presence of the officers designated by law, must be filed at the term at which the indictment is found (Code, § 4890), or, at the discretion of the court, as soon as practicable at a subsequent term; and the objection is not available on motion in arrest of judgment, when it might have been taken before the trial.

3. *Error without injury in admission of evidence.*—It is the safer practice, not to admit evidence which is at the time *prima facie* irrelevant; but, when its relevancy is shown by evidence afterwards introduced, the error in admitting it is thereby cured.

4. *Manslaughter in first degree.*—To constitute manslaughter in the first degree, as defined in the statute (Code, § 4301), there must be either a positive intention to kill, or an act of violence from which, ordinarily, in the usual course of events, death or great bodily harm may result. (Qualifying *McManus v. The State*, 36 Ala. 285.)

FROM the City Court of Mobile.

Tried before the Hon. O. J. SEMMES.

The defendant in this case, Edward M. Harrington, was indicted for the murder of John Vincent Malone, "by maltreating him in a manner and by means unknown to the grand jury;" or, as alleged in the second count, "by knocking him down, kicking him, and beating him;" or, as alleged in the third count, "by beating him, or kicking him, or throwing him upon or against some hard substance to this grand jury unknown, thereby bringing the head of said Malone in contact with such substance, inflicting an injury on his head, causing a rupture of a blood-vessel and compression of the brain." The trial was had on issue joined on the plea of not guilty, without any objection to the indictment; and it resulted in a verdict of guilty of murder in the second degree, and sentence to the penitentiary for the term of ten years.

[Harrington v. The State ]

A motion was made in arrest of judgment, on these grounds : 1st, because the grand jury was never legally organized; 2d, because the record shows that no valid indictment was found against the defendant; 3d, because the record does not affirmatively show that the grand jurors were duly sworn as required by law. In the caption of the transcript showing the organization of the court at the term at which the indictment was found, there are these recitals : "Previous to the commencement of the present term of the court, and in pursuance of law, to-wit, on the 11th January, 1886, the jury commissioners of Mobile county met in the court-house, in the office of the judge of probate, and drew the names of twenty-one persons from the jury-box of the City Court, to serve as grand jurors for the present term, as by law provided," and the names of twenty-one persons are then stated; "which drawing was duly certified by said commissioners, and deposited in the office of the judge of probate, and *venire facias* forthwith issued by the clerk of the City Court, directed to the sheriff." The return of the sheriff is then set out, showing the summons of the twenty-one persons named; after which is recited the appearance of nineteen of these persons, two of whom were excused by the court, and the completion of the grand jury by the addition of a talesman; and it is then recited, that the court administered to the foreman "the oath contained in section 4755, and to all the other jurors the oath set forth in section 4756 of the Code." The court overruled the motion in arrest.

On the trial, it was shown that the defendant, who was at the time a policeman in the city of Mobile, arrested the deceased, while drunk and disorderly, and carried him to the guard-house, with the assistance of one or two other persons; that the deceased was found dead the next morning, and, as disclosed by a post-mortem examination, that he died from the effect of a blow or wound on the head, which caused concussion or compression of the brain. Some of the witnesses for the State testified, that the defendant struck the deceased, kicked him, and knocked him down; and there was evidence, also, showing that the deceased reeled and fell heavily in the street when the defendant did not have hold of him. Several exceptions were reserved by the defendant to the rulings of the court on evidence, and also to charges given; all of which will be understood from the opinion.

[Harrington v. The State.]

Jas. Cobbs, and Samuel B. Browne, for the appellant.

Thos. N. McClellan, Attorney-General, for the State.

CLOPTON, J.—The defendant made a motion in arrest of judgment, on the ground that the indictment was not found by a grand jury legally organized. The specific objections are: it does not affirmatively appear that four of the jury commissioners were present at the drawing of the jurors, as required by the special act for Mobile county; that the grand jurors impanelled were the same persons drawn, and that the jurors were sworn according to law. When there appears of record an order of the court, or action of the presiding judge, relating to the formation of the grand jury, which is contrary to the provisions of the statute, or without warrant of law, such objection is the subject of a motion in arrest of judgment, and may be raised for the first time in this court.—*O'Byrnes v. State,* 51 Ala. 25. But section 4889 of the Code of 1876 declares, that no objection can be taken to an indictment, by plea in abatement or otherwise, on any ground going to the formation of the grand jury, except that the jurors were not drawn in the presence of the officers designated by law. It has been uniformly held, that the statute operates to prohibit any objection being taken to an indictment, based on irregularities in the organization of the jury which are cured by statute. Therefore, the grounds of objection, that the record does not show that the grand jurors were the same persons drawn, and that they were sworn in the manner directed by the Code, if they exist in fact, can be of no avail to the defendant.—*Harrington v. State,* 36 Ala. 236; *Billingslea v. State,* 68 Ala. 486; *Roe v. State,* 82 Ala. 68.

2. Section 4890 of the Code provides: "A plea to an indictment, on the ground that the grand jurors, by whom it was found, were not drawn in the presence of the officers designated by law, must be filed at the term at which the indictment is found." Notwithstanding this express provision, it has been held, that the court has the discretionary power to allow the plea to be filed at a subsequent term, the statute being considered as directory. In *Russell v. State,* 33 Ala. 366, where the statute was thus construed, it was further held, that the defendant, having had the opportunity to present the objection at a subsequent term, of which he neglected to avail himself, had no ground of complaint on

error. This construction is in harmony with the policy and spirit of the statute; which, though directory as to the prescribed term at which the plea shall be filed, impliedly requires it to be filed before the completion of the trial. Under the statute, the objection must be taken as soon as practicable after opportunity, and can not be taken after trial on the merits.—*Nixon v. State*, 68 Ala. 535. The operation of the statute is to cure the error, unless presented in proper time. The defendant raised the objection by motion in arrest of judgment, having had ample opportunity to present it before trial. It came too late, if in fact it existed. Moreover, a motion in arrest of judgment must be founded on defects apparent on the record.—*Diggs v. State*, 77 Ala. 68. The alleged defect does not appear. By fair construction, the reasonable inference is, that *all* the jury commissioners were present at the drawing.

3. The prosecuting attorney was permitted to ask the witness Smith, a physician, what was, in his opinion, the cause of the death of the deceased, on certain supposed facts. One of the hypothetic facts is, that the deceased exhibited symptoms of drowsiness while being carried to the guardhouse. The objection to the question is based on the specific ground, that there was no evidence tending to show this fact, which is a waiver of all other grounds. The court admitted the question, stating that there was but little evidence as to the facts, and, if the State did not prove the hypothetical facts, the jury would not consider the answer of the witness. It will be conceded that the evidence was irrelevant at the time the interrogatory was propounded; but, though then irrelevant, and though the better and safer practice is, when practicable, not to admit evidence unless relevant when offered, its admission will not work a reversal, if it is made relevant by evidence subsequently introduced. We think testimony, *prima facie* sufficient for this purpose, was subsequently introduced, though it may be slight. Whether or not sufficient to prove the supposed facts, on which the opinion of the witness is asked, is matter for the determination of the jury, on consideration of the whole evidence. If found insufficient, of course no value should be given to the opinion of the witness.

4. At the request of the prosecution, the court instructed the jury, in general terms: "If death ensued from the intentional application of unlawful force, though there may have been no specific intention to kill, and though the weapon

used is not ordinarily calculated to produce death, the perpetrator is at least guilty of manslaughter in the first degree." Four other charges were given, applying the same general rule to the different aspects of the case as presented by the evidence, but qualifying its application by the particular hypothesis of each instruction. The charge quoted above asserts the general proposition, that if the death of the deceased ensued from the intentional application of unlawful force, without reference to its nature and character, or to the circumstances under which applied, if not in self-defense, the defendant is at least guilty of manslaughter in the first degree.

The charge was evidently intended to be founded on the general definition of voluntarily manslaughter at common law, as given in *McManus v. State*, 36 Ala. 285. It is there defined as follows: "Voluntary manslaughter includes all felonious homicides, less heinous than murder, which resulted directly from any unlawful force, aimed at, and applied to the party slain. It was not necessary that the perpetrator should have intended or willed the death of the party. The force being unlawful, and intentionally directed against the deceased, the law pronounced the consummated act—the manslaughter—to be voluntary." In that case, the accused, while the parties were engaged in mutual combat on equal terms, threw at the deceased a piece of brick as large as one-fourth or one-half of a brick, which struck him on the side of the head, producing concussion of the brain, from which death ensued. There was evidence tending to show that the blow was struck with malice, and under such circumstances as would have constituted the homicide murder; and there was proof tending to show that it was struck in self-defense, or in the heat of passion, without any intention to kill, and, as struck with the weapon used, that death would ordinarily be very unlikely to ensue. The particular point of contention, and the only question specially considered in this respect, was, whether a specific intention to kill was an essential ingredient of the offense as defined by the statute. The ruling was, that *voluntary manslaughter*, as employed at common law, and *voluntarily depriving a human being of life*, as used in the statute, are synonymous, and that neither at common law, nor under the statute, is a specific intention to kill necessary. The definition of voluntary manslaughter as given may be, when referred to the tendencies of the evidence and the particular question involved, sufficient for the

purpose of the case; but it is too stringent for general use and application.

The charges of the court should be construed, and their correctness determined, in connection with, and in the light of the evidence. The defendant was a policeman, and at the time was engaged in arresting the deceased for disorderly conduct, and carrying him to the guard-house. The deceased resisted being arrested. There is some proof tending to show that the defendant struck him with his fist at one time, kicked him at another, and on another occasion knocked or pushed him down on the side-walk. There is, also, evidence tending to show that the deceased received the fatal injury by a fall, when another policeman had hold of him, and the defendant was walking a few paces behind. No weapon of any kind was used. The defendant was doing a lawful act, discharging an official duty. The alleged unlawfulness consisted in the nature and excess of the force employed to compel submission to arrest and imprisonment, which, there is evidence tending to show, was provoked by the resistance of the deceased, accompanied with opprobious words and epithets. Assuming for the purposes of this opinion the hypothesis of the charge, death ensued from a blow intentionally directed against the person of the deceased; and to such case we wish to be understood as restricting what may be said in reference to the constituent elements of voluntary manslaughter, excluding from the consideration cases of homicide otherwise occurring, which may be dependent on different principles.

To constitute either degree of the offense, death must be the consequence of an unlawful act; and whether the manslaughter be voluntary or involuntary, is to be determined from the attendant circumstances. The particular circumstances, which distinguish the two degrees, are not prescribed by the statute, which declares generally: "Manslaughter by voluntarily depriving a human being of life is manslaughter in the first degree; and manslaughter committed under other circumstances is manslaughter in the second degree."—Code, § 4301. The terms of the statute are employed in reference to the existing distinction and classification as understood at common law. But, if resort be had to the common-law definitions, the particular circumstances which characterize the two branches of the offense are not defined with accuracy; and no general definition is capable of covering in advance all cases. Qualifying or explanatory terms must often be

found in the special facts of the case. In the absence of a general definition sufficiently precise and distinctive, voluntary manslaughter is, by some authorities, made to depend on the presence of a positive intention to kill; and by others, it seems to depend on whether or not the blow is intentionally directed against the person of the party slain. Neither of these characteristics meets the requirements, or reaches the merits, of every case.

As applicable when the homicide occurs in a personal rencounter, or is produced by a blow aimed at the deceased, ordinarily, voluntary manslaughter is defined, an intentional killing in the heat of passion, or in hot blood, and is distinguished from murder by the absence of malice, express or implied; and "involuntary manslaughter is where one, doing an unlawful act, not felonious, nor tending to great bodily harm, or doing a lawful act without proper caution or requisite skill, undesignedly kills another,"—where death unintentionally results, so far as the accused is concerned. 1 Whar. Crim. Law, §§ 304, 305; 3 Green. on Ev., § 128. As thus defined, whether the killing is intentional, express or presumed, or unintentional, is the particular characteristic which distinguishes voluntary from involuntary manslaughter —whether death may be the probable consequence of the unlawful act, as contradistinguished from accidental, or misadventure. Voluntary, as the antithesis of involuntary, is the distinguishing quality; but not intentional, as amounting to a specific intention to kill. Intention to do great bodily harm is sufficient. In *Com. v. Gable*, 7 Serg. & Rawle, 423, Tilghman, C. J., says: "But I take it, that evidence of a positive intention to kill is not necessary, in order to constitute the crime of voluntary manslaughter. It is sufficient, if there be such acts of violence as may be expected to produce great bodily harm. On the contrary, involuntary manslaughter is, where it plainly appears that neither death nor any great bodily harm was intended, but death is accidentally caused by some unlawful act, or an act strictly lawful in itself, but done in an unlawful manner, and without due caution." A mere blow with the fist may produce death, but very rarely; and would scarcely affix the intent of such consequence. It may, however, be given with such violence, and under such circumstances, that the intent of great bodily injury, and even of death, as a consequence, may be presumed. The law does not pronounce the manslaughter to be voluntary, merely because death ensues from the in-

[Williams v. The State.]

tentional application of mere unlawful force, such as a mere blow with the fist. In order to constitute manslaughter in the first degree, there must be either a positive intention to kill, or an act of violence from which, ordinarily, in the usual course of events, death or great bodily injury may be a consequence. In this manner, and to this extent, the rule in *McManus v. State, supra,* is modified; in which modification the present Chief-Justice, who rendered the opinion, concurs.

The court erred in the charges given.

Reversed and remanded.